IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 1:14-CR-00151** |
| **v.** | : | |
| **ROSE UMANA** | : | **Judge Sylvia H. Rambo** |

# O R D E R

The background of this order is as follows: Defendant entered into a plea agreement on June 9, 2015, in which she pleaded guilty to a three-count superseding felony information charging her with making false statements relating to health care matters, in violation of 18 U.S.C. § 1035(a)(2) (Count 1), engaging in monetary transactions involving criminally-derived property, in violation of 18 U.S.C. § 1957 (Count 2), and identity theft, in violation of 18 U.S.C. § 1028(a)(7) (Count 3). (Doc. 71.) These charges arose from Defendant's operation of Vision Healthcare Services, Inc. ("Vision") and related entities, which purported to provide home attendant care and nursing services as an approved Medicaid provider.

An audit of Vision by the Pennsylvania Department of Human Services ("DHS") discovered irregularities on time sheets that indicated potential fraud, and DHS referred the matter to the Medicaid Fraud Control Section of the Office of the Attorney General. The Department of Health and Human Services as well as the

Internal Revenue Service eventually became involved in the investigation, which found that Defendant and Vision had been billing Medicaid for services provided by someone other than the listed provided, for services that were not provided at all, and for services provided by an unqualified worker. (Doc. 97, p. 4.) The total loss for these disallowed services was $1,116,802.43, which was comprised of $674,996.31 of disallowed services contained in the DHS audit, and $441,806.12 in fraudulent Medicaid reimbursements as calculated by the Medicaid Fraud Control Section. (*Id.* at p. 5.) In the plea agreement, Defendant and the Government agreed that the loss amount, for purposes of sentencing, was more than $1,000,000 but less than $2,500,000. (*Id.* at pp. 3-4.) For purposes of restitution, Defendant forfeited funds totaling $656,421.48, leaving a balance of $460,380.95 owed to the Pennsylvania Medical Assistance Program. (*Id.* at p. 5.)

Despite agreeing to a loss amount of more than $1,000,000 in the plea agreement, Defendant objected to the total loss calculated in the presentence report. Defendant retained David H. Glusman ("Mr. Glusman"), a certified public accountant and the principal of Marcum Advisory Group, to review the Government's evidence in support of the loss amount. (Doc. 105, p. 6.) Mr. Glusman found two sets of discrepancies in the DHS audit calculations, in the amounts of $9,361.27 and $115,837.00, and the Government agreed to deduct those figures from the total loss amount. In addition, Mr. Glusman's report also

states that, based on other problems he found with the investigation, the overall loss amount should be reduced by fifty-two percent. A hearing was subsequently held on June 13, 2016 and July 5, 2016 to hear Defendant's objections to the loss calculation. (*See* Docs. 115 & 116.)

At the loss hearing, the Government offered the testimony of two employees of the Medicaid Fraud Control Section of the Pennsylvania Office of Attorney General, Supervisory Special Agent Jennifer Snerr ("SSA Snerr") and Fraud Auditor Carol Palinkas ("FA Palinkas"). (*See* Hearing Transcript, Docs. 115 & 116.) SSA Snerr testified that Vision, as a provider to the Pennsylvania Medical Assistance Program, was required to adhere to the standards of practice contained in 55 Pa. Code § 1101.51(d) and (e), including maintaining proper records for each patient as well as making medical and fiscal records available for review by both State and Federal officials and their authorized agents. SSA Snerr further testified that § 1101.51(d) states that "payment will not be made" for services that do not meet those standards. Furthermore, SSA Snerr reviewed the Vision Provider Agreement, signed by Defendant on November 16, 2004, in which Defendant agreed to comply with all federal and state laws and regulations and to "certify the services or items for which payment is claimed were actually provided to the person identified as the recipient; that the claim is correctly coded in accordance with billing instructions prescribed by the Department [of Human Services], and

that all information submitted in support of the claim is true, accurate, and complete." (Hearing Transcript at p. 41.)

Despite the requirements of the Medical Assistance Program and Vision's own provider agreement, SSA Snerr testified that auditors with the Bureau of Financial Operations received incomplete documentation for claims Vision submitted. After the auditors questioned Defendant about the missing documentation, Defendant met with her employees and shortly thereafter provided pristine documents for the missing dates and times, which lead the auditors to believe that the documents had been falsified. SSA Snerr further testified that former Vision employee Chiquita Blake confirmed that Defendant directed so-called "night burners" to fabricate missing records to make it appear that legitimate services had been provided. (*Id*. at p. 40.)

Lastly, SSA Snerr testified that investigators executed search warrants on Defendant's home and business, attempting to locate supporting documents for claims billed to the Medical Assistance Program by Vision, including timesheets and skilled nursing notes. SSA Snerr testified that among the seized documents were fabricated social security cards, driver's licenses, and Department of State nursing licenses for Vision employees. The fake documents created aliases for several employees and credited them with nursing licenses that they had either lost or never obtained. Defendant admitted to investigators that she had directed her

employees to create the falsified documents in order to submit payment claims that would appear legitimate. (*Id.* at pp. 40-41.) All seized documentation was later turned over to FA Palinkas for her review.

FA Palinkas testified as to timesheets and skilled nursing notes that were submitted for six different consumers during the period of the investigation, and testified that the names on the documents were either fake names completely, names of employees that were disqualified from providing services under the Medical Assistance Program or Medicaid, or individuals who did not possess the required nursing licenses to provide the types of services indicated. FA Palinkas stated that she found a total loss of $442,037.12 for months where Vision had supplied supporting documentation for its claims for payment, and a total of $192,389.51 for months where no supporting documentation was provided. When added to the $674,996.31 amount contained in the DHS audit, FA Palinkas testified that the total loss amount for purposes of restitution was $1,309,422.94. (*Id.* at pp. 152-54.)

At the conclusion of the Government witnesses' testimony, Defendant called Mr. Glusman, who testified to the issues he had discovered with the State audit's calculations that resulted in the Government agreeing to deduct the $9,361.27 and $115,837.00 amounts from the total loss figure. Specifically, Mr. Glusman testified that some of the attendant care services that Vision purportedly provided to the six

patients in question did not require any nursing license, were actually provided, and thus those claim amounts should not be included in the restitution calculation. Mr. Glusman further opined that the patients or their representatives would have complained had they not been receiving the services for which Vision was billing, and he was unaware of any such complaints.

At the conclusion of testimony, the court ordered that both parties submit briefs regarding the proposed loss and restitution amount, and the parties complied. (Docs. 121 & 123.) The Government argues that the total restitution amount, with the agreed upon deductions subtracted, is $1,184,224.67, while Defendant argues that the appropriate total is $477,310.15. The court's finding as to the amount of loss and restitution follows.

## I. Calculation of Loss and Restitution

The Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, provides that a sentencing court shall order a defendant to make restitution to a victim who has been directly and proximately harmed as a result of the commission of an offense. 18 U.S.C. § 3663A. Restitution must be limited to "the actual loss directly and proximately caused by the defendant's offense of conviction." *United States v. Mahmood*, 820 F.3d 177, 196 (5th Cir. 2016) (first citing *United States v. Echols*, 574 Fed. App'x. 350, 359 (5th Cir. 2014); then citing *United States v. Sharma*, 703 F.3d 318, 322-23 (5th Cir. 2012)). In

healthcare fraud cases, the "actual loss for restitution purposes must not include any amount that the insurer would have paid had the defendant not committed the fraud." *Id*. The Government bears the burden of proving, by a preponderance of the evidence, the amount of loss sustained by a victim as a result of the offense. *Id*.; *see also* 18 U.S.C. § 3664(e).

Here, the Government has met its initial burden of establishing the amount of loss as it relates to each of the six patients that were the subject of the investigation. The court finds the testimony of both SSA Snerr and FA Palinkas reliable, and the timesheets and nursing notes reviewed during the two days of hearings show gross inadequacies and fraud on the part of Vision and its employees, as directed by Defendant. *See United States v. Bryson*, 485 F.3d 1205, 1208 (D.C. Cir. 2007) (holding that the district court was correct to rely on the testimony of a trained Medicare fraud investigator in determining the amount of loss and restitution in a Medicare fraud case). The key issue raised by Defendant is whether she is entitled to any offset for the value of legitimate services that were actually provided to any of the patients. The court finds that she is not.

In his report, Mr. Glusman identified certain figures for each of the six patients that he believed were legitimate, payable services rendered by Vision. However, the court finds that the documents submitted by Defendant appear to be almost entirely unreliable. As discussed above, the documentation provided by

7

Defendant shows bills for services that required certain nursing licenses, but the individuals who allegedly provided the care did not hold such licenses or held fabricated ones. Further, the names of the individuals who had purportedly provided the services were often misspelled, indicating the individual listed had not filled out the document as to how many hours of services he or she had provided to the relevant patient. Lastly, Vision's timesheets for each patient always added up to that patient's exact total allotment, which is another indication of their falsity. Employees in any field call in sick on occasion, have doctor's appointments, or need to leave work early to attend to a child, spouse, or parent. According to Vision's timesheets, however, none of its employees ever did. In fact, SSA Snerr testified that Chiquita Blake stated that it was Defendant's policy to bill the Medical Assistance Program for the allotted number of hours approved for each patient, regardless of how many hours of services were actually provided. (Hearing Transcript at pp. 39-40.)

As the Fifth Circuit has stated under similar circumstances, "the district court was certainly free to make a factual finding that [Defendant]'s fraud was pervasive or that the . . . loss figure underestimated the victims' actual loss for any number of reasons." *Mahmood*, 820 F.3d at 195 (citing *United States v. Klein*, 543 F.3d 206, 214 (5th Cir. 2008) (stating that the district court could have found that the loss figure "did not capture the full extent of the fraud")); *see also United*

*States v. Fake*, 269 F. App'x 208, 214 (3d Cir. 2008) (holding that the district court did not err in calculating loss as the total amount received from medical reimbursement programs where the defendant "would not have been eligible for reimbursement had the programs been aware of the false statements on the application, the falsified time sheets, the substandard care being rendered, and the neglect and abuse suffered by the patients."). Here, the investigation into Defendant's fraudulent scheme focused on a fairly short period of time, and the loss was calculated as to only six of Vision's more than 150 patients. Due to the pervasiveness of Defendant's fraud with regard to just the six patient files that were reviewed, an investigation into another 150 patients undoubtedly would have increased the amount of loss. To be clear, the court is not engaging in any unpermitted speculation regarding what the total loss amount could have been. Rather, the court finds that, based on the evidence presented during the loss hearings and the pervasiveness of the fraud, the loss figure as calculated by the Government understates the total actual loss. Therefore, although some small amount of the services provided with regard to the six patients may have been reimbursable under the Medical Assistance Program, Defendant is not entitled to a credit against the restitution amount due to the understatement of the loss.[1]

---

[1] The Government argues that none of the services provided were reimbursable because Defendant failed to keep complete and accurate records, and therefore did not meet the standards of either the Pennsylvania Medical Assistance Program or Medicaid. (*See* Doc. 121, pp. 34-36.)

Finally, Defendant argues that because Mr. Glusman stated in his report that the loss figure resulting from the Government's investigation, after receiving the amount from the state audit, should be reduced by fifty-two percent, that same reduction should be applied to the entire loss amount. (*See* Doc. 123, pp. 20-21.) Such a reduction is mere speculation, not supported by any evidence, and would be counter to the court's finding that the total loss in this case has been understated.[2] Accordingly, the court rejects Defendant's request for a fifty-two percent reduction of the loss amount, and the court finds that the total amount of restitution that Defendant owes is $1,184,224.67. The parties agree that the Government has seized $656,421.48 from Defendant, and thus she shall be ordered to pay the remaining $527,803.19.

For the reasons stated herein, **IT IS HEREBY ORDERED** as follows:

1) Defendant's objections to the calculation of the loss and restitution amounts are **OVERRULED**.

2) Defendant shall pay the remaining $527,803.19 in restitution.

---

The court need not reach this argument in determining whether Defendant is entitled to a credit against the restitution amount, however, because the court finds that the total loss is understated.

[2] Mr. Glusman's analysis is also partially based on his belief that each of the patients had claim administrators to whom they would have complained had they not been receiving services. This statement is also pure speculation which the court similarly rejects.

10

3) Defendant's sentencing hearing shall be held on Wednesday, December 21, 2016 at 2 p.m. in Courtroom No. 3, Eighth Floor, Federal Building, Third and Walnut Streets, Harrisburg, Pennsylvania.

s/Sylvia H. Rambo<br>
SYLVIA H. RAMBO<br>
United States District Judge

Dated: December 13, 2016